IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-60322
_____

JAMES J. FLANAGAN STEVEDORES, INCORPORATED;
SIGNAL MUTUAL INDEMNITY ASSOCIATION, LIMITED,

                                        Petitioners,

versus

JOHN C. GALLAGHER; DIRECTOR, OFFICE OF WORKER'S COMPENSATION
PROGRAMS, U.S. DEPARTMENT OF LABOR,

                                        Respondents.

--------------------
Petition for Review of an Order of the Benefits Review Board
--------------------
July 14, 2000

Before REYNALDO G. GARZA, HIGGINBOTHAM, and BENAVIDES, Circuit
Judges.

BENAVIDES, Circuit Judge.

        James J. Flanagan Stevedores, Incorporated (employer), and

Signal Mutual Indemnity Association, Limited,[1] petition for review

of a final order of the Benefits Review Board (BRB) affirming an

order by an administrative law judge (ALJ) awarding additional

benefits to John C. Gallagher (Gallagher) pursuant to the Longshore

and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et

seq.* (1994).  The issues on appeal are Gallagher's entitlement to

_____

        [1] For ease of reference, the petitioners collectively will be
referred to as employer throughout this opinion.

two periods of temporary partial disability benefits, the proper calculation of Gallagher's weekly wage used in determining the disability award, the award of attorney's fees, and the imposition of a penalty under 33 U.S.C. § 914. Finding no error, we deny the petition for review.

I.   FACTUAL AND PROCEDURAL HISTORY

Gallagher is a longshoreman who worked intermittently on the waterfront since 1959, and continuously since 1973. On January 20, 1995, while performing his duties as a longshoreman, he fell when he began to climb a ladder. He sustained injuries to his left foot, back, and neck. After receiving treatment at a hospital emergency room, Gallagher sought further treatment from an orthopedic surgeon, who released him to return to work on February 21, 1995. Meanwhile, the employer had begun voluntarily paying compensation benefits to Gallagher on January 31, 1995. Those payments were suspended when Gallagher was released to work.

Gallagher resumed working as a longshoreman. On June 27, 1995, Gallagher sought treatment from another surgeon, Dr. Swann, who immediately instructed Gallagher to stop working. A few days later, Dr. Swann performed surgery on Gallagher's heel to repair a ruptured Achilles tendon. Gallagher then began a regimen of physical therapy.

Gallagher filed a claim for compensation on August 22, 1995, and the employer again paid compensation benefits to him until he was released to light duty work on August 27, 1996. In November of

2

1996, Gallagher sought the care of another orthopedic surgeon, who provided him with a brace.

On December 6, 1996, the District Director of the Department of Labor held an informal conference. According to the employer, the following issues were discussed but not resolved at the informal conference: "average weekly wage, temporary total disability, and medical management." It is undisputed that there was a recommendation made by the District Director's office.

On February 14, 1997, while working, Gallagher's ankle "rolled over," causing him to fall. After that accident, Gallagher never again attempted to work as a longshoreman.[2]

A hearing was held before an ALJ on October 6, 1997, at which time the employer stipulated to all contested issues except Gallagher's entitlement to both temporary partial and temporary total disability benefits during two periods of time,[3] the amount of Gallagher's weekly wage, penalties under 33 U.S.C. § 914(e), and interest under 28 U.S.C. § 1961. On February 18, 1998, the ALJ issued a decision and order finding that Gallagher had a 17.5 percent partial disability in his left foot and awarding him compensation for a temporary partial disability for the two disputed periods of time based upon an average weekly wage of

---

[2] Gallagher subsequently entered a Department of Labor retraining program at a community college.

[3] Those periods are from February 21, 1995, to June 26, 1995, and from August 27, 1996, to February 14, 1997.

$929.29 and a residual earning capacity of $346.75.[4] Additionally, the ALJ awarded Gallagher a penalty for late payment of benefits due under 33 U.S.C. § 914(e). In September of 1998, the ALJ entered a supplemental decision awarding attorney's fees to Gallagher's counsel. The employer filed an emergency motion to produce or preserve evidence of counsel's billing records, which the ALJ denied. The employer appealed the ALJ's decisions and orders to the BRB, which affirmed the award.[5] The employer now petitions this Court for review.

II. ANALYSIS

A. Substantial Evidence

Our review of BRB decisions is limited to considering errors of law and whether the BRB properly concluded that the ALJ's factual findings were supported by substantial evidence on the record as a whole. *See Darby v. Ingalls Shipbuilding, Inc.*, 99 F.3d 685, 688 (5th Cir. 1996); *see also* 20 C.F.R. § 802.301(a) (setting forth BRB's scope of review of ALJ's decision). "Substantial evidence is that relevant evidence--more than a scintilla but less than a preponderance--that would cause a

---

[4] Also, due to other injuries, the ALJ found that Gallagher remained temporarily totally disabled for various periods of time. The temporary total disability compensation benefits were also based on the average weekly wage of $929.29 found by the ALJ.

[5] The BRB affirmed the ALJ's decision and order awarding benefits in all respects and affirmed the award of attorney's fees in all respects except with regard to the award of expenses, which was vacated and remanded to the ALJ for further consideration.

4

reasonable person to accept the fact finding." *Director, OWCP v. Ingalls Shipbuilding, Inc.*, 125 F.3d 303, 305 (5th Cir. 1997).

The employer argues that the ALJ's finding that Gallagher was entitled to temporary partial disability benefits during the two specified periods of time is not supported by substantial evidence because the ALJ failed to discuss and consider[6] much of the relevant evidence in violation 5 U.S.C. § 557(c)(3)(A) of the Administrative Procedures Act, which provides, in relevant part, that:

> All decisions . . . are a part of the record and shall include a statement of--
>
> > (A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record . . . .

This Court has declined to adopt the rule followed in the Third Circuit[7] "that an ALJ must articulate specifically the evidence that supported his decision and discuss the evidence that was rejected." *Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir. 1994).[8]

---

[6]  We note that, in the instant case, the ALJ expressly stated that his decision was based on "the entire record."

[7]  *See Cotter v. Harris,* 642 F.2d 700, 705 (3rd Cir. 1981).

[8]  *Falco* involved a challenge to an ALJ's failure to make and articulate credibility findings regarding a social security claimant's subjective complaints of pain.  We found the Third Circuit's rigid approach unnecessary, explaining that this Circuit had its own strictures.  For example, we require an ALJ to

5

The employer challenges the ALJ's acceptance of Gallagher's testimony that the work he performed during the two periods of time was all that he was capable of doing. However, the ALJ is a fact finder and is entitled to weigh all credibility inferences. *Avondale Shipyards, Inc. v. Kennel,* 914 F.2d 88, 91 (5th Cir. 1990). When reviewing this determination, we must be mindful not to substitute our judgment for that of the ALJ, "nor may we reweigh or reappraise the evidence, instead we inquire whether there was evidence supporting the ALJ's factual findings." *Boland Marine & Manufacturing Co. v. Rihner,* 41 F.3d 997, 1002 (5th Cir. 1995) (citation and internal quotation marks omitted).[9]

_____

articulate reasons for rejecting a claimant's subjective complaints of pain when the evidence clearly favors the claimant. *Id.*

[9] The employer also argues that the ALJ failed to give due consideration to the testimony of Peter Duffy (Duffy), an expert witness on the subject of stevedore jobs available at the Port of Corpus Christi. An ALJ may "accept any part of an expert's testimony; he may reject it completely." *Kennel,* 914 F.2d at 91. Here, the ALJ expressly considered Duffy's testimony:

> Peter Duffy testified for [the] Employer. He stated that he worked as a longshoreman for 30 years and in his opinion there was work available to [Gallagher] which he was capable of performing. Mr. Duffy pointed out that grain boats are loaded by spouts and while this is occurring the gangs do very little if any physical work. Mr. Polinard was called in rebuttal to explain there was more to the task of loading a grain boat than Mr. Duffy described.

The ALJ clearly considered Duffy's testimony; however, he reasonably concluded that the testimony of Polinard, a working longshoreman, rebutted Duffy's testimony.

In regard to the first disputed period of temporary partial disability, the ALJ considered the medical evidence and found that Dr. Snook, the physician who released Gallagher to work, "either mis-diagnosed [Gallagher's] condition or the condition greatly worsened with [his] efforts to work between February 20, 1995, and June 27, 1995." There is substantial evidence to support this finding in that on June 27, 1995, when Gallagher sought treatment from another surgeon, Dr. Swann, he was immediately advised to stop working because surgery was needed to repair a severed Achilles tendon.

In regard to the second disputed period of temporary partial disability, although Dr. Swann released Gallagher to work on August 27, 1996, the ALJ credited Gallagher's continued complaints of pain after that date. The ALJ expressly recognized that another physician, Dr. Wilk, found Gallagher "to be restricted in his activities and felt that if he persisted on longshoring he should take no jobs that required him to be on his feet for long periods." Additionally, Dr. Wilk equipped Gallagher with an air brace. Dr. Wilk also found that Gallagher's ankle was not at maximum medical improvement until January of 1997. We are satisfied that there is substantial evidence in the record to support the ALJ's finding that Gallagher was temporarily partially disabled during the two periods of time in question.

B.    Wages

The employer next argues that the ALJ erred by including a

container royalty benefit (CRB)[10] distribution as part of the calculation of Gallagher's average weekly wage pursuant to 33 U.S.C. § 902(13). Section 902(13) provides as follows:

> The term "wages" means the money rate at which the service rendered by an employee is compensated by an employer under the contract of hiring in force at the time of the injury, including the reasonable value of any advantage which is received from the employer and included for purposes of any withholding of tax under subtitle C of the Internal Revenue Code of 1954 . . . . The term wages does not include fringe benefits, including (but not limited to) employer payments for or contributions to a retirement, pension, health and welfare, life insurance, training, social security or other employee or dependent benefit plan for the employee's or dependent's benefit, or any other employee's dependent entitlement.

As the employer acknowledges, the Fourth Circuit has held that CRB payments are wages under § 902(13) if earned through work but not if earned by disability credit. *Universal Maritime Service Corp. v. Wright,* 155 F.3d 311 (4th Cir. 1998).[11] Our research

---

[10] The container royalty trust fund was established to pay longshoremen for work that historically had been done by them. Payments from that fund are called CRB's. More specifically, such payments are compensation paid by shipping companies in lieu of work lost by longshoremen due to the technological innovation of "containerized cargo." *Universal Maritime Corp. v. Wright,* 155 F.3d 311, 315-16 (4th Cir. 1998). A CRB distribution is paid annually and based on the employee's seniority and hours worked that year.

[11] *Cf. NYSA-ILA Container Royalty Fund v. Commissioner of Internal Revenue Service,* 847 F.2d 50, 52-53 (2nd Cir. 1988) (holding that payments to longshoreman from a containerization fund were wages within the meaning of FICA and FUTA); *STA of Baltimore-- ILA Container Royalty Fund v. U.S.,* 621 F.Supp. 1567 (D.Md. 1985)

indicates that this Court has yet to address this issue; however, we recently had the occasion to interpret the meaning of "wages" under § 902(13) in a different context. *See H.B. Zachry Company v. Quinones,* 206 F.3d 474 (5th Cir. 2000). In *Quinones,* the question was whether the value of meals and lodging which was exempt from withholding of federal income tax constituted "wages" under § 902(13) of the LHWCA. We rejected the argument that "any advantage" received from the employer is included as wages because that would render the phrase "and included for purposes of any withholding of tax" superfluous. We concluded that § 902(13) was clear on its face inasmuch as "[i]t provides that `wages' equals monetary compensation plus taxable advantages." Therefore, we held that § 902(13) excluded from its definition of "wages" the value of tax-exempt meals and lodging. *Id.* at 479. The rule we glean from *Quinones* to apply here is that for a CRB to constitute a wage, it must be considered either monetary compensation or a taxable advantage. Ultimately, we conclude that a CRB is a wage.

The employer argues that a CRB is a fringe benefit and thus does not constitute a wage under § 902(13). As set forth in the statute itself, the term "wages" does not include fringe benefits, including (but not limited to) employer payments for or

---

(holding that CRB distributions are wages under 26 U.S.C. § 3121, which defines wages as all remuneration for any service, because a longshoreman is not eligible for the payments until he had worked the requisite number of hours), *aff'd,* 804 F.2d 296 (4th Cir. 1986).

9

contributions to a retirement, pension, health and welfare, life insurance, training, social security or other employee or dependent benefit plan for the employee's or dependent's benefit, or any other employee's dependent entitlement. § 902(13). In *Universal,* the Fourth Circuit determined that the "bare language" of the statute was ambiguous as to where "wages" end and "fringe benefits" begin:

> If we were to read "fringe benefits" to mean all benefits given to an employee in addition to regular monetary pay, "wages" would necessarily be defined to exclude all nonmonetary compensation. This would make Congress's use of the phrase "reasonable value of any advantage" meaningless.

155 F.3d at 320. The Fourth Circuit then addressed the legislative history and concluded that "wages" include "any advantage" that is not "too speculative to be readily converted into a cash equivalent." *Id.* at 321.

The Court noted that by 1981, the BRB had consistently interpreted "wages" as including "advantages" when the advantage's value to the employee was readily identifiable and calculable. *Id.* Congress was aware of this broad interpretation of "advantages" when it introduced bills to amend Section 902(13) in 1981. Instead of narrowing the definition of advantages, Congress broadened the illustration of "advantages" encompassed by the statutory definition by including "any advantage" received from an employer which requires employment tax withholding. *Id.* at 322. Before the bill could pass both the House and the Senate, the Supreme

10

Court addressed the meaning of the language of the original §
902(13), which defined wages as including the "value of board,
rent, housing, lodging, or similar advantage received from the
employer." *Morrison-Knudsen Construction Co. v. Director, OWCP*,
461 U.S. 624 (1983). The Supreme Court concluded that as benefits
received from pensions or health and welfare plans are not "similar
advantages" to board and rent, in that they are not "benefits with
a present value that can be readily converted into a cash
equivalent on the basis of their market values." *Id.* at 630. In
so concluding, the Supreme Court reaffirmed the settled rule that
benefits which are too speculative to be readily converted into a
cash equivalent are excluded from the Act's definition of wages.
After *Morrison-Knudsen* was decided, Congress passed the afore-
mentioned bills without significant change to the definition of
"wages." As the Fourth Circuit recognized, Congress likewise was
reaffirming the settled rule that while "wages" can include more
than regular monetary pay, "fringe benefits" refers only to a class
of fringe benefits whose value is too speculative to be readily
converted into a cash equivalent. *Id.* at 324. In conclusion, the
Fourth Circuit interpreted § 902(13) as defining "wages" as
compensation paid by an employer for services rendered by an
employee, the value of which may be readily converted into a cash
equivalent. Finding the Fourth Circuit's thoughtful analysis
persuasive, we adopt their definitions of "wages" and "fringe

11

benefits." Accordingly, as a CRB is paid in dollars and cents, and, thus, its value is apparent on its face, a CRB is *not* a fringe benefit under § 902(13).

Nevertheless, the employer argues that a CRB is not a wage because it is a payment for services *not* rendered. Moreover, argues the employer, the Port of Corpus Christi, where Gallagher worked as a longshoreman, "has very little, if any, container traffic." Because Gallagher has not lost work as a result of containerization, he receives a windfall in the form of a CRB distribution check annually. The employer contends that this was not the original purpose of the trust fund.

Of course, the precise issue before us is not whether the original purpose of the container royalty trust fund has been thwarted, but, rather, whether a CRB falls within the definition of wages under § 902(13). The employer in the Fourth Circuit case raised a similar contention, *i.e.,* that the CRB payments must reflect a fixed rate of pay in order for them to be compensation for services. 155 F.3d at 325. There, the Court recognized that the local contract specified that the container royalty fund was to be used only for cash disbursements to longshoremen and that traditionally the trustees had paid royalties to those who worked 700 or more hours in the contract year. *Id.* at 325. Relying on the hours-worked requirement, the court reasoned that "[i]f these payments are paid for services, regardless of the quantity of

12

services, they meet the first requirement." *Id.*

Similarly, in the instant case, the agreement that created the royalty trust fund provides that it was created to receive contributions from employers and to administer, accumulate and/or distribute such contributions in accordance with specific provisions. The trust agreement further specifies that an employee must work a certain number of hours per year to receive such payments. Thus, Gallagher had to work a certain number of hours to be eligible to receive the CRB payments. In other words, pursuant to the terms of the contract, Gallagher was paid for his services.[12]

To reiterate, § 902(13) defines wages, in part, as "the money rate at which the service rendered by an employee is compensated by an employer under the contract of hiring in force at the time of the injury, including the reasonable value of any advantage which is received from the employer and included for purposes of any withholding of tax . . . ." Here, the employer[13] paid Gallagher a CRB pursuant to the contract of hiring at the time of his injury.

---

[12] At oral argument, the employer stated that there are exceptions to the hours-worked requirement, such as when an employee is disabled. However, there is no contention that Gallagher failed to work the amount of hours needed for the relevant year(s). We therefore do not express our opinion with respect to whether a CRB payment would constitute a wage if the employee had not earned the payment from actual work.

[13] Although the trustees of the royalty fund actually distribute the payments, the employers endow the royalty trust fund, and, thus, the employers are the source of the CRB payments. *See Universal Maritime Service Corporation,* 155 F.3d at 326 (explaining that "the true source of the payment is the employer").

13

Thus, we are persuaded that the ALJ properly included a CRB as a wage in the calculation of Gallagher's average weekly wage.

C.    Calculation of Average Wage under 33 U.S.C. §910

The ALJ calculated Gallagher's average weekly wage pursuant to § 910(c), which provides that average annual earnings shall be determined with "regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury . . ., [and] shall reasonably represent the annual earning capacity of the injured employee." We have recognized that the main objective of § 910(c) "is to arrive at a sum that reasonably represents a claimant's annual earning capacity at the time of the injury." *Empire United Stevedores v. Gatlin,* 936 F.2d 819, 923 (5th Cir. 1991) (citation and internal quotation marks omitted).

To determine Gallagher's average weekly wage, the ALJ added the following amounts from 1994 (the year prior to his injury): $35,761.66 (gross earnings); $707.56 (vacation pay); and $8,136.85 (CRB distribution). The sum total is $44,606.07. The ALJ then divided Gallagher's $44,606.07 by 48 weeks, instead of by 52 weeks.

The employer argues that using the number 48 as a divisor violated the mandate of § 910(d)(1). Section 910(d)(1) provides that the "average weekly wages of an employee shall be one fifty-second part of his average annual earnings." The ALJ chose the number 48 as a divisor because Gallagher had allegedly lost 4 weeks

14

of work in 1994 due to a previous injury.

Gallagher responds that, at most, this is harmless error. To be technically correct, Gallagher asserts, the ALJ could have divided the above sum total ($44,606.07) by 48 and obtained a weekly average ($929.29), taken that figure and added four more weeks' worth of wages (4 X $929.29 = $3,717.17) to the original sum total ($3,717.17 + $44,606.07 = $48,323.24), and finally, divided the revised total by the statutorily mandated divisor of 52 ($48,323.24 ÷ 52 = $929.29). Obviously, this calculation results in the same average weekly wage as the original calculation.

We do not read the employer's argument as challenging the factual finding that Gallagher lost four works of week in 1994 due to a previous injury. In light of the discretion given the ALJ under § 910(c),[14] we believe that the ALJ's decision to carve out the four-week period of lost work facilitated the goal of "mak[ing] a fair and accurate assessment" of the amount that Gallagher "would have the potential and opportunity of earning absent the injury." *Gatlin,* 936 F.2d at 823. As such, we are persuaded by Gallagher's argument that the apparent violation of § 910(d)(1) was harmless.

D. Attorney's Fees

1. 33 U.S.C. § 928(b)

"An award of attorney's fees by the BRB is reversed only if it is arbitrary, capricious, an abuse of discretion, or not in

---

[14] *Gatlin,* 936 F.2d at 823.

15

accordance with law." *H.B. Zachry Co. v. Jose B. Quinones*, 206 F.3d 474, 481 (5th Cir. 2000). Section 928(b) prescribes when attorney's fees may be awarded in the context of an employee's successful prosecution for additional compensation.[15] The employer argues that the ALJ erred in awarding attorney's fees because the

---

[15] Section 928(b) provides that:

> If the employer or carrier pays or tenders payment of compensation without an award pursuant to section 914(a) and (b) of this title, and thereafter a controversy develops over the amount of additional compensation, if any, to which the employee may be entitled, the deputy commissioner or Board shall set the matter for an informal conference and following such conference the deputy commissioner or Board shall recommend in writing a disposition of the controversy. If the employer or carrier refuse to accept such written recommendation, within fourteen days after its receipt by them, they shall pay or tender to the employee in writing the additional compensation, if any, to which they believe the employee is entitled. If the employee refuses to accept such payment or tender of compensation, and thereafter utilizes the services of an attorney at law, and if the compensation thereafter awarded is greater than the amount paid or tendered by the employer or carrier, a reasonable attorney's fee based solely upon the difference between the amount awarded and the amount tendered or paid shall be awarded in addition to the amount of compensation. . . . If the claimant is successful in review proceedings before the Board or court in any such case an award may be made in favor of the claimant and against the employer or carrier for a reasonable attorney's fee for claimant's counsel in accord with the above provisions. In all other cases any claim for legal services shall not be assessed against the employer or carrier.

16

prerequisites outlined in 33 U.S.C. § 928(b) were not satisfied. Section 928(b) of the "LHWCA provides for an award of attorney's fees when the employer tenders partial compensation but refuses to pay the total amount claimed by the claimant, and the claimant uses the services of an attorney to successfully recover the total amount claimed." *Boland Marine & Manufacturing Co. v. Rihner,* 41 F.3d 997, 1006 (5th Cir. 1995) (citation and internal quotation marks omitted). We have recognized that an award of attorney's fees under § 928(b) "is appropriate only if the dispute has been the subject of an informal conference with the Department of Labor." *FMC Corporation v. Perez,* 128 F.3d 908, 910 (5th Cir. 1997). More specifically, an employee may be awarded attorney's fees under § 928(b) "if, after an informal conference the employer rejects the recommendations of the Board or commissioner; the employer tenders an amount in lieu of the recommendation; the employee rejects the amount tendered by the employer; the employee hires an attorney; and the employee obtains an amount greater than the amount tendered." *Id.* at 909-911.

The employer concedes, as it must, that there was an informal conference but contends that the conference was not held with respect to the issues that were ultimately tried before the ALJ. During the administrative proceedings, the employer and Gallagher jointly stipulated that an informal conference was held on December 6, 1996. The employer's unsupported assertion does not overcome

17

the force of the joint stipulation with its implicit yet obvious implication that the informal conference involved one or more of the disputed issues before the ALJ. Moreover, the employer further concedes that the following issues were discussed during the informal conference but not resolved: "average weekly wage, temporary total disability, and medical management."[16] Of course, Gallagher's average weekly wage was one of the disputed issues at the hearing before the ALJ.

Additionally, the employer acknowledges that there was a recommendation issued after the informal conference. The employer asserts, however, that the recommendation, which was complied with, was for the employer to reinstate temporary total disability benefits. Thus, the employer contends, there was no *rejection* as required under section 928(b). Although the record indicates that

---

[16] The only reference we found with respect to the subject matter of the informal conference was made during the hearing before the ALJ. The employer's attorney on the record stated that the "topic of that informal conference . . . was the exam that the [Department of Labor] had ordered from Dr. Christensen." The ALJ then stated on the record as follows:

> Just so the record understands what we're talking about, the district director had ordered an IME a couple of weeks before this hearing here today and the claimant felt like he didn't have to go and he did not go and there was a dispute about it. But now that dispute has been resolved by agreement among the counsel that he's going to have an [examination] post hearing here in Corpus Christi.

18

the employer did, in fact, reinstate the payment of temporary total disability benefits, the employer offers no record evidence with respect to the substance of the recommendation.[17] In any event, the record does establish that at least the following unresolved issues remained after the informal conference: (1) Gallagher's average weekly wage rate; and (2) Gallagher's entitlement to temporary partial disability benefits from February 21, 1995, to June 26, 1995, and from August 27, 1996, to February 14, 1997. After presiding over a hearing on these issues, the ALJ ordered the employer to, among other things, pay Gallagher temporary partial disability benefits for the periods in dispute. In other words, after an informal conference and a recommendation, Gallagher used the services of an attorney to successfully recover an award of additional compensation. Under these particular circumstances, we find that the employer has failed to demonstrate that the ALJ erred in finding the conditions of § 928(b) satisfied.[18] Accordingly, we

_____

[17] There was a LS-206 form filed indicating that the employer reinstated the total temporary disability payments but we have found no indication that it was pursuant to a recommendation after the informal conference. The conference was held on December 6, 1996, and the LS-206 form is dated April 21, 1997.

[18] Although acknowledging that an initial reading of the language of § 928(b) supports the proposition that a written recommendation is required and that such recommendation be refused before an employer or carrier may be liable for attorney's fees, we note that the Ninth Circuit has indicated otherwise. *See National Steel & Shipbuilding Co. v. United States Dept. of Labor,* 606 F.2d 875, 882 (9th Cir. 1979) (explaining that a claimant is entitled to attorney's fees if the extent of liability is controverted and the claimant successfully obtains additional compensation regardless whether the employer rejects the administrative recommendation);

conclude that the employer has not shown that the awarding of attorney's fees constituted an abuse of discretion or was not in accordance with the law.

### 2. Reasonableness

The employer further asserts that the ALJ's determination of the attorney's hours, fee rate, and expenses used in calculating the award were unreasonable. In support of this assertion, the employer refers us to previously filed briefs, presumably before the ALJ and BRB. By failing to include these arguments in the body of their brief, the employer, in effect, has abandoned them. *Yohey v. Collins,* 985 F.2d 222, 224-225 (5th Cir. 1993); *see also* Fed. R. App. P. 28(a)(9) (requiring the argument section of the appellant's brief to contain "contentions and the reasons for them, with citations to the authorities and parts of the record . . . .").[19]

### E. Penalties

The employer's final argument is that the ALJ clearly erred in finding that it was liable for penalties under 33 U.S.C. § 914.

---

*Matulic v. Director, Office of Workers Compensation Programs,* 154 F.3d 1052, 1061 (9th Cir. 1998) (same). In the instant case, we express no opinion as to whether we agree with the Ninth Circuit's interpretation of the requirements of § 928(b) inasmuch as the employer has failed to offer (and we to find) any record evidence supporting their allegations regarding the substance of the recommendation.

[19] The employer further contends that the ALJ erred in denying its motion to produce or preserve evidence with respect to Gallagher's attorney's billing and time records. Because the employer has abandoned the argument regarding the reasonableness of the attorney's fees award, we need not reach this contention.

Section 914(e)[20] provides that when an installment of compensation is not paid within 14 days of when it is due, a 10 percent penalty will be added unless an employer files a notice that it controverts the employee's right to compensation pursuant to the terms of section 914(d).[21]  Section 914(d) provides that:

> If the employer controverts the right to compensation he shall file with the deputy commissioner on or before the fourteenth day after he has knowledge of the alleged injury or death, a notice, in accordance with a form prescribed by the Secretary, stating that the right to compensation is controverted, the name of the claimant, the name of the employer, the date of the alleged injury or death, and the grounds upon which the right to compensation is controverted.

In his decision and order, the ALJ expressly recognized that the parties had stipulated that the employer filed a "notice of controversion" on August 22, 1995.  The employer now argues that

---

[20]  Section 914(e) states:

> If any installment of compensation payable without an award is not paid within fourteen days after it becomes due, as provided in subdivision (b) of this section, there shall be added to such unpaid installment an amount equal to 10 per centum thereof, which shall be paid at the same time as, but in addition to, such installment, unless notice is filed under subdivision (d) of this section, or unless such nonpayment is excused by the deputy commissioner . . . .

[21]  The employer also argues that the ALJ erred in awarding "interest under § 914(e)."  The ALJ's order awarded interest under 28 U.S.C. § 1961, the general statute that allows district courts to award interest on any money judgment in a civil case.  The employer has not shown that the ALJ erred in awarding interest on the judgment to Gallagher.

21

the ALJ clearly erred when he failed to recognize that the employer filed an *earlier* notice of controversion on February 22, 1995. This argument fails in light of certain stipulations that the parties made during the proceedings before the ALJ. In a joint exhibit, the parties stipulated that, among other things, (1) "the Employer was notified or had knowledge of the injury [on] January 20, 1995;" and a (2) "Notice of Controversion (LS-207) was filed on August 22, 1995." Under the stipulated facts, the employer clearly failed to file a notice that it controverted compensation within 14 days of having notice of Gallagher's injury, rendering the imposition of penalties under § 914(e) appropriate. The employer does *not* argue that the ALJ's conclusion is wrong based on the stipulated facts--but rather argues that the ALJ either "disregarded" or "overlooked" the evidence. The employer is bound by its stipulations. *See Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 188 F.3d 278, 281 n.1 (5th Cir. 1999).

The employer nevertheless asserts that the LS-208 form[22] it filed on February 22, 1995 satisfied the notice of controversion requirement under section 914. In response, Gallagher asserts that the employer did not raise this particular argument before the BRB.

---

[22] The stipulation, however, was that a LS-207 form was filed. We note that § 914(d) provides that an employer controverts the employee's right to compensation by filing "a notice, in accordance with a *form prescribed by the Secretary* . . . ." (emphasis added). Although it is not clear, it appears that the LS-207 is the form prescribed by the Secretary for an employer to file notice that it controverts an employee's right to compensation.

22

Our review of the record indicates that Gallagher is correct, and the employer did not file a reply brief informing us otherwise. We therefore may not consider it. *See Ingalls Shipbuiding v. Director, OWCP,* 976 F.2d 934, 938 (5th Cir. 1992) (rejecting employer's argument that another form was the equivalent of a "notice of controversion" because the employer failed to present that argument in the administrative proceedings). As such, the employer has failed to show that the ALJ erred in finding it liable for penalties and interest under § 914.

For the above reasons, the petition for review is DENIED.